GENERAL INSTRUMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GENERAL INSTRUMENT & APPLIANCE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 47349, 47350. Filed February 28, 1961.

*Jay O. Kramer, Esq., Morton A. Smith, Esq.,* and *Ludwig B. Prosnitz, CPA,* for the petitioners.
*Arnold I. Weber, Esq.,* for the respondent.

WITHEY, *Judge:* The respondent denied petitioners' applications for relief and claims for refund of excess profits tax under section 722 of the Internal Revenue Code of 1939 for the taxable years ended February 28, 1942, February 28, 1943, February 29, 1944, and February 28, 1945, together with carryback and carry-forward adjustments to the taxable years ended February 28, 1941, and February 28, 1946.

Petitioner, General Instrument Corporation, has abandoned at the trial all issues raised by its petition herein.

The sole issues presented are:

(1) Whether petitioner, General Instrument & Appliance Corporation, qualifies for relief under section 722(b)(4) of the 1939 Code on the ground that its average base period net income was an inadequate standard of normal earnings because prior to the end of the base period it had been committed to a course of conduct which subsequent to the base period resulted in a change in its capacity for production or operation.

(2) Whether petitioner's (General Instrument & Appliance Corporation's) claim for refund of excess profits tax for the fiscal year ended February 29, 1944, is barred by the expiration of the period of limitations provided in section 322 of the 1939 Code.

Such of the facts as have been stipulated are found accordingly.

General Instrument Corporation (sometimes hereinafter referred to as Instrument) is a corporation organized under the laws of the State of New Jersey on February 24, 1937, as the successor to a corporation of the same name organized under the laws of the State of New York on October 10, 1923, with its principal place of business located at Elizabeth, New Jersey. It filed its excess profits tax returns for the fiscal years ended February 28, 1941 through 1943, with the district director of internal revenue at Newark, New Jersey.

General Instrument & Appliance Corporation (sometimes hereinafter referred to as petitioner or Appliance) is a corporation organized under the laws of the State of New Jersey on April 16, 1938, with its principal place of business located at Elizabeth, New Jersey.

Petitioner filed its excess profits tax returns with the director of internal revenue at Newark, New Jersey, for the years 1942, 1943, 1945, and 1946 on the indicated dates and disclosing excess profits tax liability in the amounts as follows:

| Fiscal year ended Feb. 28— | Date filed | Liability |
|---|---|---|
| 1942 | June 15, 1942 | $57, 609. 91 |
| 1943 | July 15, 1943 | 572, 002. 38 |
| 1945 | July 13, 1945 | 528, 538. 47 |
| 1946 | July 15, 1946 | 86, 271. 18 |

Additional excess profits tax liability was subsequently assessed against petitioner for the fiscal years ended February 28, 1943, February 29, 1944, and February 28, 1945, in the amounts as follows:

| Year | Additional tax liability |
|---|---|
| 1943 | $73, 711. 35 |
| 1944 | 33, 162. 89 |
| 1945 | 7, 338. 38 |

The period of limitations for the assessment of income and excess profits taxes for the fiscal years ended February 28, 1942, 1943, 1945, and 1946, was extended to the following dates by the execution of waivers (Form 872):

| Year | Date to which extended | Year | Date to which extended |
|---|---|---|---|
| 1942 | June 30, 1946<br>June 30, 1947<br>June 30, 1948<br>June 30, 1949 | 1945 | June 30, 1949 |
| 1943 | June 30, 1947<br>June 30, 1948<br>June 30, 1949 | 1946 | June 30, 1950<br>June 30, 1951<br>June 30, 1952 |

*Issue 1. Section 722 Relief.*

FINDINGS OF FACT.

Petitioner, General Instrument & Appliance Corporation, is a wholly owned subsidiary of General Instrument Corporation, which is a well-known manufacturer of radio components and a leader in its field. During the base period and for many years prior thereto Instrument manufactured and sold variable condensers. Instrument was essentially a two-man corporation during the base period years. It began exploratory development of new products during the base period. It was the established policy of Instrument that any products other than condensers which it might decide to produce would be manufactured and sold by a subsidiary corporation. The principal reason underlying this policy was the protection of Instrument against possible patent infringement liabilities.

Instrument began the development of a pushbutton tuner for use in car radios and in April 1938 it formed General Instrument & Appliance Corporation for the purpose of manufacturing and selling such tuning devices. Prior to the incorporation of Appliance, Instrument had been aware (as early as 1937) of patent infringement possibilities with respect to pushbutton tuners.

After Appliance began the manufacture and sale of pushbutton tuners, it received early in 1939 communications from various customers to whom it had sold tuning devices stating that certain inventors had claimed that its tuner infringed on existing patents. Petitioner informed these customers that in the opinion of its counsel the tuners it manufactured and sold did not infringe upon the existing patents. Appliance also advised its customers that it would defend any suit brought against any customer for an alleged infringement of patents covering construction of its pushbutton tuning device. Detrola Corporation, Noblitt Sparks Industries, Inc., Park-Withington Corporation, Delco Radio Division, General Motors Corporation, and Emerson Radio and Phonograph Corporation were among the customers so advised.

It was the practice for new products to be developed by Instrument because it alone possessed a work force, adequate working capital, and a credit rating in the industry. However, in the production of the pushbutton tuner all of the direct costs such as labor and material were incurred by petitioner and indirect costs were charged to petitioner through an established system of allocating expenses.

During the latter part of 1938, Instrument began to consider the development of an automatic record changer. The changer under consideration was a small, inexpensive automatic record changer which could be plugged into a radio or fitted into a combination unit or

console model such as those manufactured by General Electric, Emerson, and Philco. Not having experience with this line of products, Instrument decided to acquire experienced personnel to assist in the development of a record changer. In February 1939, Leo Glaser, an engineer, was hired to develop a record changer guided by Instrument's engineering department. In the course of his work in developing a record changer, Glaser invented certain patentable items on which letters patent were issued and assigned to Instrument.

In the development of a product such as an automatic record changer many operations necessarily precede the completion of a finished product. After an idea is conceived, drawings and blueprints are made, the development of patentable items is carried on, tests are conducted, the market is reviewed to determine whether or not the device would be an acceptable sales item, and hand models are produced. All of these operations with respect to the record changer were conducted during 1939 primarily by Instrument.

Any product or part which was to be engineered either by Appliance or by Instrument was entered in an engineering project book (called an E.P. Book) which is similar to an engineering control book. Not only products of Appliance and Instrument were entered in such book but any item which was jobbed out to them also was entered. Generally, no project was entered in the E.P. Book unless it was considered to be of substantial merit. Minor items or minor modifications of existing products were not recorded. The E.P. Book contains an E.P. number, a description of the product to be engineered, and a date. The date appearing in the E.P. Book represents the date that engineering was commenced on the product. Depending upon the complexity of a new item, months of research and development are required prior to the beginning of engineering thereon. Products of a complex nature such as the automatic record changer require substantial development prior to their entry in the E.P. Book and the commencement of engineering.

The first record changer model was entered by Instrument in the E.P. Book on September 28, 1939, and was designated as E.P. 56. This eventually became petitioner's Model 100 record changer. E.P. 57 was dated October 17, 1939, and ultimately became Appliance's Model 101 record changer. The basic difference between Model 100 and Model 101 was that the latter model could carry both 10- and 12-inch records whereas the former could accommodate only 10-inch records. The ability to carry two sizes of records requires a different dropping mechanism but the turntable, motor, and other component parts were the same in Model 101 as in Model 100.

During September and October of 1939, blueprints and working drawings on E.P. 56 were produced by Instrument. In addition, a parts list for the model was drawn in late September or early October

1939. The preparation of both the parts list and the drawings required significant development and research for many months. In the engineering of many products which were manufactured by Instrument it was customary where speed was essential to use freehand drawings (scaled) in the development of the product.

Hand models of its record changer were demonstrated by Instrument in 1939 to various potential customers including Philco Corporation and Emerson Radio and Phonograph Corporation. Instrument concluded in September 1939, partially on the basis of the reaction of potential customers to the product, that its record changer was a commercially marketable item. After the E.P. number for the first model record changer had been assigned on September 28, 1939, Instrument's engineering department began designing working parts and part prints. After the part prints were prepared they were released to the production division where the tools were made. In the production division the part prints were studied in an effort to determine the most economical method for tooling the part. Instrument then released the print to its tool division where a tool designer would design the tool and then produce it.

Since the record changer differed materially in design and materials from the existing products of Instrument and Appliance, new types of machinery were needed, particularly heavy stamping presses; also, a much heavier gage steel was required and the plant needed rearranging to facilitate full-scale production.

The tooling needed for the manufacture of the record changer required a minimum of 3 months' preparation.

Petitioner and Instrument occupied the same premises, the Waverly Terminal in Elizabeth, New Jersey, during the base period years. Instrument originally acquired these premises on August 5, 1935, under an option agreement providing an initial trial period ending February 1, 1936, followed by a 5-year lease. This lease extended to the tenant a 1-year option to cancel on February 1, 1937, which it did not elect to exercise, but continued in possession under the original lease until January 1940, when a new lease was executed. At the time the decision was made to begin work on the record changer, Appliance did not possess sufficient manufacturing space to commence full-scale production and the available space in Waverly Terminal was not of the proper type for such manufacturing. The manufacturing activities of Appliance and Instrument had been conducted on the second floor of the Waverly Terminal Building during the base period years. However, because of the large stamping presses required and the heavy gage steel needed in the production of the record changer, the acquisition of ground floor space with increased carrying capacity became a necessity.

In the fall of 1939 negotiations were commenced between Appliance and Instrument and Waverly Terminal looking toward the acquisition of additional space. The treasurer of Instrument was the chief negotiator on behalf of the tenant in the dealings surrounding the new lease. The negotiations were conducted in the name of Instrument because the landlord would not accept petitioner on the lease since it did not then have a sufficient credit rating and also because the landlord had dealt with Instrument in prior years and wished to continue the same arrangement. At the time of the commencement of negotiations for leasing additional space Waverly Terminal was informed by Instrument that extra space was required for the manufacture of a record changer and that ground floor carrying capacity was essential. No ground floor space was available in Waverly Terminal in 1939.

On December 13, 1939, Waverly Terminal, after extensive preliminary discussions with officers of Instrument and petitioner, made the following written offer:

1. We will make you a six year lease, covering your present premises of 95,200 square feet at the old rate of $18,660.00 per annum, plus 43,000 square feet adjoining to the north and south at the rate of 22¢ per square foot which is the same as applied to your last additions.—a total of $28,120.00 per year. You shall have the right to cancel at the end of three years by giving three months' notice and also by payment of a penalty equal to three months' rent.

On December 18, 1939, a tentative "lease agreement" was prepared by officials of Instrument and Appliance reciting that "The following verbal agreement was reached by Mr. Riker at Waverly Terminal and our Mr. Bloom at their meeting on December 16, 1939, at which Mr. Steinberger and Mr. Miller were present."

On December 21, 1939, a further memorandum was signed by M. L. Miller of Instrument following discussions with Adrian Riker of Waverly Terminal and officials of petitioner and Instrument relating to certain alterations and repairs necessary to make the premises suitable for occupancy.

The final lease was executed in January 1940.

During the course of the negotiations regarding the lease, the president of petitioner was present at many of the meetings and participated in a dual capacity, both as president of Appliance and as comptroller of Instrument. Appliance ratified the actions of Instrument in the negotiations for this additional space. The new lease called for the occupancy of 47,300 square feet of additional space (over and above the space then occupied by petitioner and Instrument). Under the provisions of the new lease the additional space was to become available on March 1, 1940.

Under date of December 31, 1939, petitioner received a bill from its patent attorneys for services rendered since November 30, 1939,

in connection with their investigation of phonograph record changers shown in recorded patents. In the development of the automatic record changer, Instrument adhered to its established policy of assigning to a subsidiary corporation (Appliance) the manufacture and sale of the new product for purposes of protecting the parent corporation from possible liability for patent infringement.

The actual factory tooling for the production of the record changer was commenced by Appliance on or about March 19, 1940. The first shipments of record changers to customers were made during August 1940.

The record changer manufactured and sold by petitioner could be placed in a console radio-phonograph combination or it could be used with a radio if connected thereto by means of a plug or jack. A radio mechanic or handyman could connect such a record changer to a radio equipped with a jack in a few minutes. When a record changer was plugged into a radio set, the radio signal was prevented from being transmitted through the loudspeaker of the radio by (1) the installation of a two-way jack which would cut off a portion of the radio circuit, (2) the installation of a switching arrangement, or (3) turning the tuning dial on the radio set to a position where it would be free from emitting an audio signal. Generally, radio manufacturers prior to 1940 equipped only the high-priced and medium-priced radio sets with jacks suitable for plugging in a phonograph attachment. Beginning in 1940, many of the popular low-priced radio sets were so equipped because of the increasing popularity of phonographs.

The record changer mechanism as produced by petitioner was not salable to an ultimate consumer without being mounted and enclosed in a case or cabinet. Among petitioner's customers for record changers were Philco Corporation, General Electric Corporation, and Emerson Radio Corporation. The foregoing customers used petitioner's record changers in combination radio-phonograph models as well as marketing the record changer by itself for use in connection with home radios.

The type of record changer manufactured by petitioner was considerably lower in price than any other record changer manufactured during 1938, 1939, or 1940, and was intended for sale to the mass market, as compared with the class market. No record changer produced during the base period years was designed for low pricing and mass market consumption.

In 1939 there were approximately 27,500,000 radio sets in homes in the United States.

During 1940 there were approximately 158 models of radio phonographs with automatic record changers on the market. These units

ranged in price from $49.95 to $395 and were manufactured by 27 different companies.

Radio production for the years 1936 to 1941, inclusive, in terms of total units, including home, portable, and automobile radios, was as follows:

| Year | Total units | Year | Total units |
|---|---|---|---|
| 1936 | 8, 249, 000 | 1939 | 10, 763, 000 |
| 1937 | 8, 083, 000 | 1940 | 11, 831, 000 |
| 1938 | 7, 142, 000 | 1941 | 13, 642, 000 |

The retail sales of radio sets to the public during the years 1936 to 1941, inclusive, were as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1936 | $6, 746, 000 | 1939 | $9, 500, 000 |
| 1937 | 6, 631, 000 | 1940 | 10, 000, 000 |
| 1938 | 5, 832, 000 | 1941 | 11, 100, 000 |

The annual production of radio-phonograph combination units in the United States for the years 1936 to 1941, inclusive, was as follows:

| Year | Units | Year | Units |
|---|---|---|---|
| 1936 | 59, 000 | 1939 | 475, 000 |
| 1937 | 58, 000 | 1940 | 901, 000 |
| 1938 | 350, 000 | 1941 | 1, 214, 000 |

Phonograph record sales for the years 1936 to 1941, inclusive, were as follows:

| Year | Units | Year | Units |
|---|---|---|---|
| 1936 | 32, 000, 000 | 1939 | 50, 000, 000 |
| 1937 | (¹) | 1940 | 75, 000, 000 |
| 1938 | 36, 000, 000 | 1941 | 117, 000, 000 |

¹ Not available.

Consumer expenditures for radios, phonographs, parts, and records for the years 1936 to 1942, inclusive, were as follows:

| Year | Amount | Year | Amount |
|---|---|---|---|
| | (*Millions*) | | (*Millions*) |
| 1936 | $278 | 1940 | $129 |
| 1937 | 322 | 1941 | 535 |
| 1938 | 278 | 1942 | 556 |
| 1939 | 356 | | |

A certified public accountant was employed by General Instrument Corporation in 1924 and was subsequently employed by its subsidiary,

Appliance. He and his firm have been employed continuously in that capacity since that time. The accountant's function was to audit the books of Instrument (and Appliance, after its formation) quarterly or semiannually through the years 1936 through 1939. During the 1940's he also prepared the tax returns of Instrument and Appliance, prepared annual reports, and represented both corporations before the Internal Revenue Service.

The accountant met with the officers of Instrument and its board of directors frequently throughout the years 1936 through 1939 and was a regular attendant at its board meetings after 1940. He conferred with Cohen and Blumenkranz, the principal owners of Instrument, frequently, and discussed the activities of the corporation and its subsidiary, Appliance. Periodically the accounts of both petitioner and Instrument were also checked by well-known public accounting firms which found petitioners' records to be in good order.

Upon the formation of petitioner, the accountant directed it to set up and maintain a complete set of accounting records. Appliance kept a regular payroll book in which it recorded direct labor charges. Material used by petitioner was assembled directly from bills of materials and charged to it. When material was taken out of the general stock of Instrument, requisitions were summarized and Appliance was charged for such material.

Overhead (indirect expense) was charged to petitioner at the end of each fiscal year by allocating such expenses in direct proportion to the respective sales of Instrument and Appliance. Such indirect expense items included rent, insurance, telephone, advertising, office salaries, and development costs. The respondent's agent, upon examination of petitioner's books and records for the fiscal years ended February 29, 1940, and February 28, 1941, allocated all of its expenses on the basis of sales and petitioner acquiesced thereto. Thereafter similar adjustments were made by the respondent for the fiscal years ended February 28, 1942 and 1943.

Any patents on the devices manufactured by Appliance were taken out in the name of Instrument, capitalized on the books of Instrument, and depreciated over a period of 17 years from the date of acquisition. Such patents as were used by petitioner were nominally owned by Instrument and were licensed to Appliance. Patent expenses and legal expenses incurred in connection with patents were charged to petitioner under the method of allocation following the general sales ratio.

Appliance maintained a factory payroll ledger during the years 1939, 1940, and 1941.

A certificate issued by the director of internal revenue at Newark, New Jersey, on October 8, 1941, registered Appliance as a manufacturer for excise tax purposes.

Petitioner reached full production of its record changer in September 1941 and began customer billing at approximately that time. By the end of its fiscal year 1941, such billings amounted to over $1 million. The billings for the first 6 months of the fiscal year 1941 in the amount of $300,000 had been carried on the accounts of Instrument and were subsequently transferred from its books to the books of petitioner.

Petitioner sold and shipped the following number of record changers during the last 6 months of 1941 and the first 2 months of 1942:

| 1941 | Units | 1942 | Units |
|---|---|---|---|
| July | 4, 592 | January | 18, 011 |
| August | 11, 396 | February | 16, 805 |
| September | 13, 718 | | |
| October | 14, 225 | | |
| November | 19, 323 | | |
| December | 13, 682 | | |

The average price at which its record changers were sold by petitioner was $9.50. The OPA ceiling price in effect for record changers during 1941 was $8.74.

All income resulting from the manufacture and sale of record changers for the fiscal year ended February 28, 1942, was reflected on petitioner's books and Federal tax returns.

The combined net sales of Appliance and Instrument for the fiscal years ended February 28, 1939, and February 29, 1940, reflected a percentage increase of 16.9 percent.

Petitioner's net sales, gross profit from sales, and net income for the fiscal years ended February 28, 1939 to 1946, inclusive, as reflected in its income tax returns for those years, were as follows:

| Fiscal year ended— | Net sales | Gross profit from sales | Net income as reported |
|---|---|---|---|
| Feb. 28, 1939 | $334, 308. 63 | $136, 900. 48 | $40, 606. 34 |
| Feb. 29, 1940 | 208, 550. 71 | 43, 789. 31 | 33, 780. 12 |
| Feb. 28, 1941 | 118, 879. 82 | 40, 710. 25 | 35, 080. 29 |
| Feb. 28, 1942 | 1, 313, 268. 49 | 434, 522. 85 | 197, 141. 04 |
| Feb. 28, 1943 | 3, 739, 158. 58 | 1, 298, 347. 41 | 719, 114. 68 |
| Feb. 29, 1944 | 5, 595, 313. 38 | 2, 531, 591. 55 | 1, 868, 766. 53 |
| Feb. 28, 1945 | 3, 552, 192. 31 | 1, 287, 765. 68 | 686, 448. 33 |
| Feb. 28, 1946 | 4, 139, 510. 64 | 1, 802, 157. 48 | 171, 964. 47 |

The consolidated operating profit and consolidated net profit (before taxes) ratio to net sales of Instrument and Appliance for the fiscal years ended February 28, 1939 to 1942, inclusive, were as follows:

| Fiscal year ended— | Operating profit | Net profit (before taxes) |
|---|---|---|
| | (Percent of net sales) | |
| Feb. 28, 1939 | 11.0 | 12.6 |
| Feb. 29, 1940 | 9.7 | 10.5 |
| Feb. 28, 1941 | 2.5 | 3.2 |
| Feb. 28, 1942 | 10.6 | 15.7 |

Petitioner's excess profits credit for the fiscal years ended February 28, 1942 to 1946, inclusive, as finally adjusted, was $38,097.75 (representing 95 percent of the average base period net income computed under the provisions of section 713(f) of the 1939 Code). The average base period net income was computed under the provisions of section 713(f) as follows:

| | Fiscal year ended— | | | |
|---|---|---|---|---|
| | Feb. 28, 1937 | Feb. 28, 1938 | Feb. 28, 1939 | Feb. 29, 1940 |
| Excess profits net income | [1] $4,914.17 | [1] $4,914.17 | $40,102.90 | $26,527.43 |
| 1. Aggregate for last half of base period | | | | 66,630.33 |
| 2. Aggregate for first half of base period | | | | 9,828.34 |
| 3. Excess of line 1 over line 2 | | | | 56,801.99 |
| 4. One-half of line 3 | | | | 28,400.99 |
| 5. Aggregate for last half of base period | | | | 66,630.33 |
| 6. Total of lines 4 and 5 | | | | 95,031.32 |
| 7. Line 6 divided by number of months in last half of base period, multiplied by 12 | | | | 47,515.66 |
| 8. Line 7, or highest excess profits net income for any base period year, whichever is the lesser amount | | | | 40,102.90 |

[1] 8 percent of $61,427.18.

Petitioner's average base period net income is an inadequate standard of normal earnings because during a taxable year subsequent to the base period there was a change in its capacity for production or operation of its business as a result of a course of action to which it was committed prior to January 1, 1940. The business of the petitioner did not reach by the end of the base period the earning level which it would have reached if it had made the change in its capacity for production or operation 2 years before it did so. The petitioner's excess profits tax computed under the Internal Revenue Code without the benefit of section 722 results in an excessive and discriminatory tax.

### OPINION.

Petitioner contends that it is entitled to excess profits tax relief under section 722(b)(4) of the 1939 Code, claiming a commitment to a course of action prior to January 1, 1940, resulting in a change in

capacity for the production or operation of its business consummated during a taxable year ending after December 31, 1939.[1]  Such change in the capacity for production or operation of the business resulting from a commitment to a course of conduct during the base period is deemed to be a change in the character of the business as of December 31, 1939, under the provisions of section 722(b)(4).  Petitioner's position is that it had committed itself during 1939 to the production of an automatic record changer which it began actually to produce in August 1940, and that it did not reach by the end of the base period the level of earnings it would have reached had the change occurred 2 years earlier.

The respondent has taken the position that petitioner made no commitment during the base period years to a course of action resulting in an increase in capacity for production or operation, that no actual change in capacity for production or operation is shown to have existed, and that petitioner improperly relies upon the acts of its parent corporation (Instrument) in establishing its claim for relief on the ground of a commitment during the base period to produce an automatic record changer.  Respondent further contends that assuming adequate grounds for relief under section 722(b)(4) have been established by petitioner, it nevertheless has failed to show a constructive average base period net income which would result in excess profits tax relief.

The record herein contains extensive evidence of a commitment during 1939 to the ultimate production of an automatic record

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\*　　　\*　　　\*　　　\*　　　\*　　　\*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time.  For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation of management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished.  Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business \* \* \*

changer. Instrument began consideration of the development of an automatic record changer during the latter part of 1938. In February 1939, it hired Leo Glaser, an engineer, to develop a suitable record changer. In the ensuing months, Glaser developed a satisfactory design for an automatic record changer. His salary was paid by petitioner. The necessary tests, drawings, and blueprints, the development of patentable items, the completion of demonstration models, and a review of the potential market for such a record changer were completed by Instrument during 1939. The engineering on petitioner's Model 100 record changer was commenced on September 28, 1939, and the necessary engineering with respect to its Model 101 record changer was begun on October 17, 1939. A parts list for the Model 100 record changer was drawn up in late September or early October 1939. Hand models of its record changer were demonstrated during 1939 to various potential customers. The directors of Instrument and Appliance concluded in September 1939 that its automatic record changer was a commercially marketable item.

In the fall of 1939 negotiations were commenced between Appliance, Instrument, and Waverly Terminal for the purpose of acquiring additional factory space for the manufacture of the record changer. During December 1939 all of the important provisions of a new lease calling for the occupation of 47,300 square feet of additional space to become available as of March 1, 1940, were agreed upon. These provisions were contained in memoranda and a written offer signed by Waverly Terminal, all of which are dated during December 1939. Waverly's offer was accepted with minor exceptions by petitioner and Instrument December 21, 1939. The lease was executed January 30, 1940.

It appears from the record that petitioner began the redesigning of its production facilities and the preparation of tools and dies needed for the production of the record changer during the latter part of 1939.

The commitment contemplated by section 722(b)(4) need not take the form of a legally binding commitment. *Studio Theatre Inc.*, 18 T.C. 548. A change in position unequivocally showing an intent to make a change in capacity for production or operation appears to have been the essential factor the establishment of which was contemplated by Congress under section 722(b)(4). S. Rept. No. 1631, 77th Cong., 2d Sess., p. 202 (1942). Here, petitioner has amply demonstrated its overall economic commitment during 1939 to produce an automatic record changer. Most of the numerous factors that necessarily go into the birth and ultimate production of a new product occurred during 1939. Further, in view of the amounts ex-

pended by petitioner during 1939 for labor, materials, the demonstration of hand models, the redesigning of facilities, preparation for tooling, etc., it does not appear that it could have withdrawn on December 31, 1939, from its extensive preparations for producing the automatic record changer without suffering substantial financial losses. See E.P. C. 15, 1947–1 C.B. 89.

The newly acquired space in the Waverly Terminal Building became available to petitioner on March 1, 1940, and the Model 100 record changer was first tooled for production March 19, 1940. The first commercial sales of the record changer occurred in August 1940 and its production continued until approximately April 23, 1942, at which time all such production for civilian use was terminated by Government order. During October, November, and December 1941, the petitioner sold a total of 47,230 record changer units.

The respondent's contention that the development and manufacture of the Model 100 and Model 101 record changers actually were carried on by Instrument rather than by Appliance is not supported by the record. It is clear from the evidence herein that Appliance actually manufactured the record changer as well as handled the sales thereof. Appliance paid the direct costs of the development of the record changer, such as labor and materials. Overhead, which consisted of rent, insurance, advertising expense, officers' salaries, telephone, development costs, and office salaries, was allocated between Instrument and petitioner on the basis of the total volume of sales of the two corporations, which allocations were acceded to by respondent.

The record here does not indicate that Appliance was merely a sales agent rather than a manufacturer of record changers. The leasing and use by Appliance of manufacturing tools and equipment, the use by it of factory space in Waverly Terminal, and the payment of a portion of the overhead expense and all of the direct costs (until allocated in proportion to the volume of sales, as recommended by respondent), together with the maintenance of a payroll account covering its factory payroll, establish that it was engaged in the manufacturing business.

The petitioner here does not rely on the action of Instrument but upon its own conduct. Appliance paid Instrument rental for the use of factory space and machinery. As to the development of the record changer, petitioner acted through Instrument as its agent. However, such actions as were undertaken in the name of Instrument were paid for by Appliance and were the acts of petitioner as a matter of fact. Petitioner was Instrument's agent for the manufacture and sale of the record changer and, conversely, Instrument was petitioner's agent for the development thereof.

Instrument maintained a policy of turning over to petitioner for manufacture and sale all products other than radio condensers. The principal reason for the creation of petitioner in 1938 and the transfer to it of items, other than condensers, for manufacture and sale was for the protection of Instrument from liability for patent infringement. To effectuate such a purpose, it was necessary that Appliance manufacture as well as sell the record changer. See 35 U.S.C. sec. 271. To have created petitioner as a mere legal or economic sham would have been insufficient to shield Instrument from liability in patent infringement suits.

It is incumbent upon petitioner, having demonstrated its commitment during 1939 for an increase in its productive capacity, to establish a resulting increase in capacity for production or operation consummated after the base period, and to show a constructive average base period net income sufficient to result in excess profits tax relief. Sec. 722(b)(4), I.R.C. 1939; *Empire Liquor Corporation*, 25 T.C. 1183; *Sartor Jewelry Co.*, 22 T.C. 773; *Triangle Raincoat Co.*, 19 T.C. 548. Appliance has demonstrated that with 2 additional years' experience its capacity for manufacturing record changers would have been approximately 190,000 units per year. This is based upon its actual production shipments during the months of October, November, and December 1941. To thus establish petitioner's productive capacity does not violate the statutory prohibition against consideration of post-1939 data, as respondent contends, for a commitment case by its very nature involves changes and events consummated after the base period, and it is clear that Appliance's increased capacity for production or operation may be shown by the use of post-1939 experience. *Springfield Tablet Manufacturing Co.*, 22 T.C. 35; *Southern California Edison Co.*, 19 T.C. 935. Although we question whether petitioner in 1938 and 1939 could have sold as many record changers as it would have been able to produce, the existence of a market for a small, low-priced unit has been demonstrated.

After considering carefully petitioner's reasons supporting its suggested index for backcasting earnings in its reconstruction of average base period net income, we are of the opinion that the general business index (Series C) of 91.2 published by the respondent is the appropriate index figure and should be utilized for the backcasting of 1939 earnings. E.P.C. 8, 1947–1 C.B. 73.

Taking into account the state of the market for record changers in 1938 and 1939, petitioner's increased capacity for production, a net profit ratio based upon its experience with items produced during the base period, and utilizing the general business index as published by the respondent, we are of the opinion that a fair and just

amount representing a properly reconstructed average base period net income would be $125,000. Because petitioner did not arrive at its normal rate of production until September of 1941 the variable credit rule must be applied to the fiscal year ended February 28, 1942, for which year the constructive average base period net income is $75,000.

### Issue 2. Statute of Limitations.

#### FINDINGS OF FACT.

Petitioner filed tentative income and excess profits tax returns for the fiscal year ended February 29, 1944, on or about May 15, 1944, and also requested and received an extension of time until July 15, 1944, within which to file its final returns. The tentative income and excess profits tax returns were executed by petitioner's president and secretary.

On July 14, 1944, and July 15, 1944, Appliance filed its completed Forms 1120 and 1121, respectively, purporting to be its final income and excess profits tax returns for the fiscal year ended February 29, 1944. These forms were signed and sworn to by only one officer of petitioner, its secretary. Form 1121 filed by Appliance for the fiscal year ended February 29, 1944, disclosed excess profits tax liability in the amount of $1,464,046.08.

Petitioner and respondent executed a waiver (Form 872) on January 14, 1947, purporting to extend the period of limitations until June 30, 1948. On February 20, 1948, a second waiver (Form 872) was executed purporting to extend the period of limitations on assessment of tax until June 30, 1949.

Appliance made a series of payments on its excess profits tax liability on the dates and in the amounts as follows:

| Date of payment | Amount |
| --- | --- |
| July 15, 1944 | $3,628.70 |
| Sept. 1, 1944 | 357,023.04 |
| May 17, 1944 | 371,371.30 |
| Nov. 17, 1944 | 366,011.52 |
| Feb. 22, 1945 | 366,011.52 |
| | 1,464,046.08 |

On April 29, 1949, petitioner made a payment on a subsequent assessment of excess profits tax liability with respect to the fiscal year ended February 29, 1944, in the amount of $29,846.60, and on August 1, 1949, it made an interest payment thereon in the amount of $8,778.94.

Petitioner filed its application for relief (Form 991) and claim for refund (Form 843) of tax with respect to the fiscal year ended February 29, 1944, on June 21, 1949.

OPINION.

The respondent has taken the position that petitioner has not filed a valid excess profits tax return for the fiscal year ended February 29, 1944, inasmuch as the completed Form 1121 filed on July 15, 1944, was executed only by the secretary of Appliance. Petitioner had at that time a president who was also the treasurer as its principal officer. The reason for the failure of the president to sign the completed form does not appear in the record. It is the respondent's position that petitioner failed to file a valid return for the fiscal year ended February 29, 1944, under the requirements of section 52(a) of the 1939 Code[2] and that its claims for relief and refund of tax are untimely under the provisions of section 322(b)(1) of the Code which provide that if no return is filed by a taxpayer, no credit or refund shall be allowed after 2 years from the time the tax was paid, unless before the expiration of such 2-year period a claim for refund is filed.[3]

Section 52(a) of the Code requires that corporate tax returns shall be sworn to by the president, vice president, or other principal officer and by the treasurer, assistant treasurer, or chief accounting officer. The requirements of section 52(a) are explicit and mandatory. *Fourth & Railroad Realty Co.*, 25 T.C. 458. In *Burford Oil Co.* v. *Commissioner*, 153 F. 2d 745, affirming 4 T.C. 613, the Court of Appeals for the Fifth Circuit held that the tax return of a corporation signed only by the treasurer was not valid, stating at page 746:

Section 52 of the Internal Revenue Code[1] [footnote omitted] sets out the requirements for a tax return in mandatory language. It provides that the return shall be sworn to by the president, vice president, or other principal officer *and* by the treasurer, assistant treasurer, or chief accounting officer.

---

[2] SEC. 52. CORPORATION RETURNS.

(a) REQUIREMENT.—Every corporation subject to taxation under this chapter shall make a return, stating specifically the items of its gross income and the deductions and credits allowed by this chapter and such other information for the purpose of carrying out the provisions of this chapter as the Commissioner with the approval of the Secretary may by regulations prescribe. The return shall be sworn to by the president, vice president, or other principal officer and by the treasurer, assistant treasurer, or chief accounting officer. In cases where receivers, trustees in bankruptcy, or assignees are operating the property or business of corporations, such receivers, trustees, or assignees shall make returns for such coporations in the same manner and, form as corporations are required to make returns. Any tax due on the basis of such returns made by receivers, trustees, or assignees shall be collected in the same manner as if collected from the corporations of whose business or property they have custody and control.

[3] SEC. 322. REFUNDS AND CREDITS.

(b) LIMITATION ON ALLOWANCE.—

(1) PERIOD OF LIMITATION.—Unless a claim for credit or refund is filed by the taxpayer within three years from the time the return was filed by the taxpayer or within two years from the time the tax was paid, no credit or refund shall be allowed or made after the expiration of whichever of such periods expires the later. If no return is filed by the taxpayer, then no credit or refund shall be allowed or made after two years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer.

It is without dispute that taxpayer failed to comply with this provision, and the conclusion of the Tax Court wherein the return is condemned is supported by decision. Lucas v. Pilliod Lumber Co., 281 U.S. 245, 50 S. Ct. 297, 74 L. Ed. 829, 67 A.L.R. 1350; Plunkett v. Commissioner, 1 Cir., 118 F. 2d 644, 649; Uhl Estate Co. v. Commissioner, 9 Cir., 116 F. 2d 403. Cf. Dr. Salsbury's Laboratories v. United States, 8 Cir., 133 F. 2d 641.

The petitioner first contends that it has substantially complied with the substance and purpose of the provisions of section 52(a) and cites several decisions for the proposition that substantial compliance is all that is required under that section. It is the petitioner's position that the purpose of the enactment of section 52(a) is to insure the submission of the required information in a return sworn to by officers of the corporation who are personally familiar with its affairs and inasmuch as the record herein discloses that the secretary of Appliance was authorized to sign the checks of that corporation and in fact did so from the time of its formation until July 30, 1942, that it has substantially complied with the provisions of that section.

*Indiana Rolling Mills Co.*, 13 B.T.A. 1141, is the principal decision upon which petitioner relies in support of its contention concerning substantial compliance under section 52(a). In that case the taxpayer's income and excess profits tax returns were sworn to by its vice president and its secretary. The returns were not false or fraudulent and no waiver had been executed by the parties. The respondent issued a statutory notice of deficiency subsequent to the expiration of the period of limitations on assessment. The Commissioner there took the position that the statutory period of limitations had never commenced to run because of the taxpayer's failure to file a proper return. We held the returns as filed were valid and that the substitution of the signature of the taxpayer's secretary for its treasurer or assistant treasurer fulfilled the purpose of the statutory provision. In so holding, we there stated, at page 1144:

The statute provides that every corporation subject to taxation shall make a return, stating specifically the items of its gross income and the allowable deductions and credits, and further provides that the return shall be sworn to by the president, vice president, or other principal officer and by the treasurer or assistant treasurer.

What is the essence of the thing required to be done by this statute? It is, we think, the making of an honest return by the corporation, wherein are set forth specifically the items of its gross income and the allowable deductions and credits, in order that the Commissioner may determine the correct amount of its tax liability. If such required information is fairly and honestly given in a return sworn to by officers of the corporation who are familiar with its affairs, this in our opinion constitutes a substantial compliance with the provisions of the statute.

However, the facts presented in *Indiana Rolling Mills Co.*, *supra*, are distinguishable from those here presented, and we are unable to find any support whatever for the proposition that the signature on

a corporate return of *one officer only* by itself constitutes substantial compliance. Our decision in *Burford Oil Co.*, 4 T.C. 613, directly holds that a return filed by a corporation which was signed only by the company treasurer is not a valid return under section 52(a), and that the requirements of that section are mandatory and cannot be waived.

Petitioner next contends that whereas the return filed by it on July 15, 1944, may by itself be invalid under the provisions of section 52(a), that return should be coupled with the tentative return filed on or about May 15, 1944, which was properly signed by two of its officers, and that both returns should be considered together in determining whether it has substantially complied with the requirements of that section. We have been unable to find any authority in support of this approach to determining the statutory validity of a corporate return, and petitioner has cited none.

In *Florsheim Bros. Co.* v. *United States*, 280 U.S. 453, the Supreme Court held that a tentative return filed in conjunction with a request for an extension of time for filing a completed return is not a statutory instrument and is without legal effect. The Court pointed out that a tentative return is a purely administrative document devised for the mutual convenience of the taxpayer and the Commissioner. The purpose of a tentative return was there stated by the Court to be the securing by the taxpayer of a needed extension of time for filing its completed statutory return without defeating the Government's right to the prompt payment of the first installment of tax due. The Supreme Court held that since the tentative return there in evidence made no reference whatever to income, deductions, or credits, which are required to be included in a return by section 52(a), the tentative form filed by the taxpayer could not have been intended as the proper statutory return.

Further, it is apparent from reading section 52(a) that its purposes cannot be served merely by filing the requested number of sworn signatures on a blank document and then subsequently filing the requested information concerning income, deductions, and credits on an unsigned or unsworn form as was the case here. The requirements of the statute can be satified only by affixing the sworn signatures to the document containing the required information.

The petitioner's final contention is that the expiration of the period of limitations for filing refund claims was suspended by the series of payments made on its excess profits tax liability during 1944 and 1945 totaling $1,464,046.08, which was well within the period of time as extended by the waivers executed by it and respondent extending the period of limitations first, until June 30, 1948, and finally, until June 30, 1949. The first waiver was executed on January 14, 1947, and the second on February 20, 1948. The waivers thus were executed

within 2 years from the time the tax was paid. Section 322(b)(3) provides that if the Commissioner and the taxpayer have executed a timely agreement in writing under the provisions of section 276(b) to extend the time within which the Commissioner may make an assessment beyond the period described in section 275, the period within which a claim for refund or credit may be filed, or a credit or refund allowed, shall be the period within which the Commissioner may make an assessment pursuant to such an agreement or any extension thereof, and 6 months thereafter.[4] The Forms 872 here in evidence and executed on the dates heretofore mentioned with respect to the petitioner's fiscal year ended February 29, 1944, purport on their face to be such agreements pursuant to the provisions of section 276(b). Section 276(b) provides that if before the expiration of the period prescribed in section 275 for the assessment of tax the Commissioner and the taxpayer consent in writing to its subsequent assessment, the tax may be assessed at any time prior to the expiration of the period agreed upon.[5] Section 276(a) provides that in the event of failure on the part of a taxpayer to file a return the tax may be assessed, or a proceeding commenced for the collection of such tax without assessment, at *any* time.[6] Further, section 275 provides generally that taxes shall be assessed within 3 years after the *return* was filed. Thus, if no return is filed there is no applicable period of limitations upon the Commissioner's powers of assessment. Therefore, since in the instant case no proper statutory return was ever filed with respect to the fiscal year ended February 29, 1944, the waivers executed by the parties under section 276(b) are a nullity and wholly meaningless. The language of the waivers themselves shows that a return must have been filed for any agreement thereunder to be effective.

---

[4] SEC. 322. REFUNDS AND CREDITS.

(b) LIMITATION ON ALLOWANCE.—

\* \* \* \* \* \*

(3) EXCEPTIONS IN THE CASE OF WAIVERS.—If both the Commissioner and the taxpayer have, within the period prescribed in paragraph (1) for the filing of a claim for credit or refund, agreed in writing under the provisions of section 276(b) to extend beyond the period prescribed in section 275 the time within which the Commissioner may make an assessment, the period within which a claim for credit or refund may be filed, or credit or refund allowed or made if no claim is filed, shall be the period within which the Commissioner may make an assessment pursuant to such agreement or any extension thereof, and six months thereafter, except that the provisions of paragraph (1) shall apply to any claim filed, or credit or refund allowed or made, before the execution of such agreement. \* \* \*

[5] SEC. 276. SAME—EXCEPTIONS.

(b) WAIVER.—Where before the expiration of the time prescribed in section 275 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

[6] SEC. 276(a). FALSE RETURN OR NO RETURN.—In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

The absence of a proper return here results in the total inapplicability of any statutory period of limitations on the assessment of tax for the fiscal year ended February 29, 1944. The petitioner and respondent did not create any period of limitations on assessment by the execution of the purported waivers (Forms 872), for the provisions of section 276(a) provide specifically that there are no statutory limitations on assessment in the event a return is not filed. Inasmuch as no statutory return was filed by petitioner for the taxable year ended February 29, 1944, the prescribed time limitations for filing a claim for refund of any portion of the excess profits tax liability in the amount of $1,464,046.08 expired 2 years after the date on which the final installment was paid. The final installment of tax was paid on February 22, 1945, and the period of limitations prescribed by section 322(b) for the filing of refund claims expired on February 22, 1947. Petitioner filed its claim for refund of excess profits tax with respect to its fiscal year ended February 29, 1944, on June 21, 1949. Therefore, such claim for relief and refund of tax with respect to its payments of excess profits tax in the amount of $1,464,046.08 was barred by the expiration of the period of limitations prescribed in section 322(b)(1).

Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*